IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOANNA McDANIEL and RONNIE McDANIEL,
JOE ANN DUNCAN,
CAROLYN EMERSON and JOSEPH EMERSON,
FRANK WHITE and WALTER WHITE,
MICHAEL PRATT and DEBORAH PRATT,
JEREMIAH BOOHER and DANNY BOOHER,
DELORIS DAVIS, ROSEMARY HART and
GEORGIA WILSON

    Plaintiff,                                  No. _____

vs.

UNITED STATES OF AMERICA,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
ENVIRONMENTAL RESTORATION, LLC;
GOLD KING MINES CORPORATION;
WESTON SOLUTIONS INC.;
HARRISON WESTERN CONSTRUCTION CORPORATION.;

    Defendants.

**COMPLAINT FOR PERSONAL INJURIES AND DAMAGES**

Plaintiff Joanna and Ronnie McDaniel, Joe Ann Duncan, Carolyn and Joseph Emerson, Frank and Walter White, Michael and Deborah Pratt, Jeremiah and Danny Booker, Deloris Davis, Rosemary Hart, Georgia Wilson (herein after collectively referred to as "Plaintiffs") by and through their attorneys of record, Will Ferguson & Associates (Kedar Bhasker & Adrian Vega), and for their Complaint for Personal Injuries and Money Damages, states as follows:

**THE PARTIES**

1. Plaintiffs Joanna and Ronnie McDaniel are residents of Aztec, San Juan County, New Mexico. The McDaniels own an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

1

2. Plaintiff Joe Ann Duncan is a resident of Aztec, San Juan County, New Mexico. Ms. Duncan owns an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

3. Plaintiffs Carolyn and Joseph Emerson are residents of Aztec, San Juan County, New Mexico. The Emersons own an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

4. Plaintiffs Frank and Walter White are residents of Aztec, San Juan County, New Mexico. Frank and Walter White own an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

5. Plaintiffs Michael and Deborah Pratt are residents of Aztec, San Juan County, New Mexico. The Pratts own an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

6. Plaintiffs Jeremiah and Danny Booher are residents of Aztec, San Juan County, New Mexico. Jeremiah and Danny Booher own an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

7. Plaintiff Deloris Davis is a resident of Aztec, San Juan County, New Mexico. Ms. Davis owns an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

8. Plaintiff Rosemary Hart is a resident of Aztec, San Juan County, New Mexico. Ms. Hart owns an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

9. Plaintiff Georgia Wilson is a resident of Aztec, San Juan County, New Mexico. Ms. Hart owns an interest in property adjacent to the Animas River in northern New Mexico and sustained personal injuries and property damage as a result of the release.

10. The USEPA is an agency of the United States responsible for maintaining and enforcing national standards under environmental laws and regulations, in consultation with state, tribal, and local governments. The USEPA may be served at its principal office located at 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460, or at the United States Attorney's Office for the District of New Mexico.

11. The United States of America includes all agencies of the federal government, including the USEPA. On December 6, 2016, the Plaintiffs submitted an administrative claim to the USEPA under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. ("FTCA"). The USEPA denied that claim by letter dated January 12, 2017.

12. Environmental Restoration is a Missouri limited liability company with its principal office at 1666 Faick Drive in Saint Louis, Missouri. Its registered agent is "Corporation Service Company," located at 123 East Marcy Street, Suite 101 in Santa Fe, New Mexico 87501.

13. Weston Solutions, Inc. is a Pennsylvania corporation with headquarters at 1400 Weston Way, P.O. Box 2653, West Chester, Pennsylvania 19380. At all times relevant to this suit, Weston Solutions was the Superfund Technical Assessment and Response Team ("START") contractor for USEPA at the Gold King and Red and Bonita Mines. Its registered agent is Corporation Service Company, located at 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501. At the time of the Gold King Mine spill, Weston Solutions was conducting business in New Mexico under contract to provide investigation, remediation, and restoration of abandoned oil and gas well sites and production facilities in New Mexico.

14. Harrison Western Construction, Corporation, (Harrison Western) is a Colorado corporation with headquarters at 1208 Quail Street, Lakewood, Colorado 80215. At all times relevant to this suit, Harrison Western was an expert subcontractor for USEPA at the Gold King and Red and Bonita Mines. Its registered agent is Corporation Service Company, located at 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501. At the time of the Gold King Mine spill, Harrison Western was conducting business in New Mexico under contract for their technical expertise.

15. All the above-named Plaintiffs are properly joined in this action under Federal Rule of Civil Procedure Rule 20. Fed. R. Civ. P. 20.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346 because Plaintiffs have brought claims against the United States of America, Environmental Protection Agency for personal injury and property damage/loss; 28 U.S.C. § 1346 provides that the district courts have exclusive jurisdiction of civil actions on such claims.

17. This Court has jurisdiction over Plaintiffs' claims against Defendants other than the United States pursuant to 28 U.S.C. § 1332(a)(1) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states given the fact that no Plaintiffs are citizens of the same state as any Defendants.

18. This Court also has supplemental jurisdiction over Plaintiffs' claims against Defendants other than the United States pursuant to 28 U.S.C. § 1367(a).

19. Venue is proper in the United States District Court for the District of New Mexico under 28 U.S.C. § 1391(b).

## **SOVERIEGN IMMUNITY IS WAIVED UNDER THE FEDERAL TORT CLAIMS ACT**

20. Pursuant to the Federal Tort Claims Act ("FTCA"), "[t]he United States [is] liable…in the same manner and to the same extent as a private individual under like circumstances…". 28 U.S.C. § 2674. Thus, the FTCA waives sovereign immunity of the United States for loss caused by the negligent or wrongful acts of government employees acting within the scope of their employment. 28 U.S.C. § 1346(b), *Ayala v. United States*, 980 F.2d 1342, 1343 (10th Cir. 1992)

21. The "discretionary function exception" prohibits any claim against the United States, "based on the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 § U.S.C. 2680(a).

22. The determination of whether the discretionary function applies to a particular act, however, boils down to a two-pronged analysis of the nature of the act. *See Berkovitz v. United States, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988)*. First, the act must "involve an element of judgment or choice" if the exception is to apply. *Id.* at 536. Under this first prong, we must determine whether a specific and mandatory regulation, statute or policy requires a particular course of action. *Id.* If a specific and mandatory statute, regulation or policy is applicable, "there is no discretion ... for the discretionary function exception to protect" and the Government's action in connection therewith will be subject to an FTCA claim. *Id* at 536.

23. If, on the other hand, the Government's conduct is not controlled by specific directives, we must proceed to the second prong of the analysis and determine whether the discretion involved "is of the kind that the discretionary function was designed to shield." *Id.* at 537. Ordinary discretion, such as that exercised by a government agent in driving

5

his automobile "on a mission connected with his official duties," is not the kind of discretion that the exception was designed to shield. *See United States v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). Rather, the exception was designed to shield only discretion that is "based on considerations of public policy." *Berkovitz*, 486 U.S. at 537.

24.     The discretionary function exception does not apply when technical considerations govern the decision. *See Ayala, 980 F.2d at 1349*.

25.     Plaintiffs, similar to the *Ayala* case, do not contest the broad discretion Defendants had when they decided to maintain the Gold King Mine but address the specific technical objective standards Defendants violated when they maintained the mine. *Id*.

26.     Sovereign immunity is waived in this case due to the negligent and grossly negligent actions of Defendants in violation of federal regulations and policies, engineering and safety standards, and best practices, as alleged herein.

27.     Sovereign immunity is waived in this case because Defendants actions were not the kind that the discretionary exception was "designed" to shield. *See Berkovitz*, 486 U.S. at 536.

## GENERAL ALLEGATIONS

28.      On August 5, 2015, the Defendants caused an unprecedented environmental disaster when they negligently and grossly negligently maintained an abandoned gold mine dam ("Gold King Mine") and released more than three million gallons of toxic acid mine waste into the waters upstream of the Plaintiffs in violation of objective safety standards.  At least 880,000 pounds of heavy metals poured out and coursed through downstream waterways, including miles of the Animas River (the "River").

29.      The Defendants knew or should have known that there was a substantial risk of a blowout but made the technical choice to excavate near an entrance at the Gold King Mine

without a required plan.

30. Before taking heavy machinery to a site known to be impounded with highly contaminated water, the Defendants failed to abide by objective safety standards to protect the Plaintiffs and others downstream. They did not test for water pressure. They did not await advice from experts who were scheduled to assess the site before the activities began. They did not have emergency procedures in place. They knowingly ignored procedures designed to reduce the likelihood of a blowout. In short, they were completely unprepared and unequipped to be doing anything near the Gold King Mine under the known conditions.

31. Still, they proceeded to operate heavy machinery near the very barrier that held back millions of gallons of highly pressurized and toxic water. When that barrier sprung a leak and quickly escalated to a massive blowout, the Defendants admitted they had no idea what to do. They were wholly unprepared to mitigate the damage they had recklessly unleashed.

32. On July 13, 2015, a Final Site Health and Safety Plan was reviewed and approved by the USEPA on-scene coordinator ("OSC") and made part of the final Gold King Mine work plan. It purported to have been prepared "in accordance with OSHA 29 CFR 1910," and it required that "[a]ll work will be performed in accordance with applicable Federal 29 CFR 1910 and 1926 Health and Safety Regulations and the Federal 29 CFR 1910.120 Hazardous Waste Site Safety Regulations."

33. On or about July 23, 2015, the USEPA and Weston visited the Gold King Mine again to measure discharge flow. That same day, a plan was discussed regarding the installation of a sump basin to treat water that would be pumped from the mine for work scheduled to begin in August 2015.

34. On or around July 23, 2015, USEPA's OSC, Steven Way briefly spoke with a

civil engineer at the Bureau of Reclamation ("BOR") because he was unsure about the Gold King Mine plans and wanted an outside, independent review. They agreed that on August 14, 2015, the BOR engineer would conduct an all-day, on- site assessment of the Gold King Mine plans.

35. In late July and early August 2015, Defendants were on-site taking measurements and preparing for the excavation. In late July or early August, Steven Way (the "Original OSC") left for vacation, leaving Hays Griswold (the "Substitute OSC") in charge in the interim.

36. Prior to leaving, on July 29, 2015, Way emailed specific instructions concerning the work at the Gold King Mine site to Defendants. These instructions made clear, like the work plans, that the work crew was to provide adit[1] drainage control and implement a water management system—including stinger pipes, a sump, and sump-pump—*before* any excavation took place. In forwarding these instructions to Griswold that same day, Way noted that Harrison Western, the subcontractor who prepared the revised excavation plans and who was responsible for bringing the stinger pipe and other drainage equipment to the site—was not set to mobilize until the week of August 17. Way also provided clear verbal direction to Griswold and the contractors not to proceed with any work on opening the adit until after his return and the planned consultation with BOR on August 14. Griswold also reviewed the final work plan.

37. Nevertheless, on August 4, despite not having an adequate emergency response plan in place, and lacking any equipment to mitigate an uncontrolled release of water from the mine, the USEPA and its crew of contractors ("USEPA crew") began negligently digging into the adit with a backhoe. Photographs confirm that the crew did not dig at an elevation higher than they had dug the previous year where they hit impounded water. They did not "ramp up," despite

---

[1] The term "adit" is used to describe a horizontal or nearly horizontal tunnel or passageway into an underground mine that can be used for draining, ventilation, and extraction, and is also used to explore for mineral veins.

8

explicit instructions and work plans to the contrary. Nor did they attempt to stabilize the mine portal and adit with wire mesh and anchors as they excavated, as required by the May 2015 Action/Work Plan. Rather, they dug at the same elevation as the drainage pipes where they had dug a year prior, removing a substantial amount of soil. They did this without a pump, hose, stinger, sump or sump-pump in place. And they did this without Harrison Western present; the mine and performance expert who prepared the excavation plans and was responsible for bringing the pipes to draw down the impounded water inside the mine prior to excavation.

38. Because they were excavating in the same place, the USEPA and its contractors observed concerning conditions similar to what was seen the previous year: namely, water was seeping out where they were digging, which they assumed to be about 5-6 feet above the adit floor. However, the technique which was used at the Red and Bonita Mine under similar circumstances (and which was required by the Gold King work plan)—simply drilling into the mine from above to determine the water level inside the mine prior to excavating—was not used. According to the BOR, following that approach would likely have prevented the massive blowout Defendants caused on August 5.

39. On August 5, 2015, the USEPA, Environmental Restoration, and Weston returned to the Gold King Mine. Two DRMS abandoned mine specialists arrived on-site and joined the Substitute OSC and contractors to collectively assess the conditions at the adit. The USEPA crew's careless or reckless assessment caused them to misjudge the level of the water and the height of the portal. In addition to the careless and/or reckless conduct and assessments, the crew working on-site also blatantly disregarded explicit instructions. As described, on July 29, 2015, the Original OSC emailed specific instructions to the crew working on the Gold King Mine site, including representatives of Weston and Environmental Restoration. These instructions differed from the

actions actually taken on August 5, 2015.

40.     Defendants were not prepared to deal with a rapid release of water from the mine, even though this very result was anticipated as a possibility. A video from the Gold King Mine on the day of the spill shows an on-scene worker asking right after the blowout, "What do we do now?" further evidencing the lack of preparedness on the part of those on site. Indeed, the parties did not take reasonable steps after the flooding began, or to assess the impact on those downstream. They also initially reported the spill to be a one-million-gallon release, underestimating the volume by at least a factor of three.

41.     Even after the blowout, the Defendants negligently failed to notify downstream communities in a timely and responsible fashion. While the Release occurred on August 5, the USEPA incredibly did not inform the Plaintiffs that a toxic plume was advancing in the Animas River for nearly two days.

42.     The Release continues to harm the Plaintiffs, and will do so for years to come, until at least such time as the Plaintiffs' sites are fully restored. The Plaintiffs are reminded of this devastating pollution every time there is a rainfall, as the toxic elements are dredged up from the River's floor where they have come to rest.

43.     On information and belief and as described herein, the work conducted by the Defendants in connection with the Gold King Mine amounted to reckless, careless, slipshod, and otherwise negligent action that was not driven by policy considerations.

44.     As a result of this conduct, millions of gallons of contaminated water that was stored behind collapsed material spilled out into Cement Creek, a tributary of the Animas River. The U.S. Geological Survey estimated the amount of contaminated water released from the Gold King Mine to be more than three million gallons. Subsequent data has revealed that at least

880,000 pounds of metals were released into the Animas River that day. This release illegaly caused the metals concentrations in the Animas River to exceed federal and state water quality standards. It is estimated that roughly eighty to ninety percent of this amount remains embedded in the riverbeds upstream of the Plaintiffs and threatens to re-mobilize during natural runoff, storms, or other events.

45. Defendants owed a duty to the Plaintiffs to conduct, regulate, maintain, and oversee the operations, investigations, and conditions at the Gold King Mine in a reasonable manner and with reasonable care. Failure to exercise reasonable care in these circumstances posed a foreseeable risk of harm to the Plaintiffs downstream.

46. Defendants neglected to perform the necessary engineering analysis to properly assess the level of water and the pressure built up inside the mine before reconvening the excavation work in 2015. Defendants then operated heavy machinery at the Gold King Mine on August 5, 2015, near the collapsed material blocking the pressurized water buildup, with knowledge of the risk of a blowout.

47. Defendants did not have emergency response procedures or plans in place in the event that the identified possibility of a blowout materialized. Indeed, the USEPA's own internal investigation confirmed that the team lacked the required emergency protocols to handle a significant flow or blowout.

48. As a result of the lack of preparedness, the Defendants did not adequately respond to the situation immediately after the blowout occurred, including but not limited to taking reasonable efforts to mitigate or abate the flow of toxic, contaminated water into the Animas River.

49. The actions and omissions of Defendants in connection with the August 5 Release

11

violated applicable safety and other industry standards for conducting activities under these conditions.

50. The Defendants wantonly and negligently failed to promptly inform downstream jurisdictions about the massive release of toxic, contaminated water headed toward their communities via the Animas River.

51. The Plaintiffs bring this case to hold the Defendants accountable for their negligence and gross negligence. The Plaintiffs are entitled to relief for these harms.

## **FIRST CLAIM FOR RELIEF**

(NEGLIGENCE AND NEGLIGENCE PER SE AGAINST ALL DEFENDANTS)

52. The Plaintiffs incorporate by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

53. Defendants were subject to a duty to carry out their activities in connection with the Gold King Mine with the level of care that someone of ordinary prudence would have exercised under the same circumstances. This includes, but is not limited to, following reasonable engineering, mining, safety, and other applicable standards in the industry, as well as EPA, National Oil and Hazardous Substances Pollution Contingency Plan (NCP), and OSHA regulations, Federal Statutes and the laws and regulations of the states of Colorado and New Mexico. Defendants breached these statutes and regulations and their duties of reasonable care, and it was foreseeable that their breaches would cause injury to the Plaintiffs.

54. Defendant United States, through its agent USEPA, and Defendants Environmental Restoration and Weston breached their duties in the following ways, among others:

      a. Failing to ascertain the level of pressure present behind the collapsed material at the adit before beginning to excavate;

b. Assuming that the seepage level outside the Gold King Mine indicated the water level inside the mine;

c. Failing to use excavation methods proven to reduce the likelihood of a blowout, including failing to provide the required support system to stabilize the mine portal prior to excavation, as required by the work plan and by the applicable "Specific excavation requirements" of 29 C.F.R. § 1926.651(i);

d. Initiating excavation work at the Gold King Mine prior to the arrival of the licensed experts and without otherwise engaging an employee, consultant, or other agent with the requisite level of engineering experience to inspect the Gold King Mine conditions, as required by the "Specific excavation requirements" of 29 C.F.R. § 1926.651(k);

e. Carelessly overseeing the operation of heavy machinery near the earthen plug in the Gold King Mine in violation of 40 C.F.R. § 300 et seq.

f. Commencing work at the Gold King Mine on August 5, 2015 without having the proper water management and treatment equipment in place, contrary to instructions and the work plan, and contrary to the requirements of the applicable "Specific excavation requirements" of 29 CFR § 1926.651(h);

g. Neglecting to follow instructions, regulations, and best management practices when carrying out activities at and related to the Gold King Mine;

h. Failing to comply with the work plan's provision for "ramping up" to a higher elevation before excavating, as required by 29 C.F.R. § 1910.120(b)(1)(iii);;

13

    i. Failing to have in place an adequate emergency response plan sufficient to guide them in the event of a blowout like the one that occurred on August 5, 2015, as required by 29 C.F.R. § 1910.120(l);

    j. Failing to adequately train workers on-site to deal with expected emergencies like the blowout that occurred on August 5, 2015, as required by 29 C.F.R. § 1910.120(e)(7);

    k. Failing to exercise reasonable care in their immediate efforts to halt or otherwise mitigate the release of the toxic wastewater and other contaminants into Cement Creek; and

    l. Failing to notify those impacted by the release in a timely and reasonable fashion, as required by 40 C.F.R. § 300.135(j)(1).

55. Under the doctrine long ago elucidated in Rylands v. Fletcher, a negligent release of stored water that damages downstream interest holders is actionable and Defendant are prima facie for all damages.

56. Defendants were negligent per se when they violated the laws and regulations of the State of Colorado which include, but are not limited to the following:

    a. 5 CCR 1002-85, Nutrients Management Control Regulation;

    b. 5 CCR 1002-62, Regulations for Effluent Limitations;

57. Defendants were negligent per se when they violated the laws and regulations of the State of New Mexico which include, but are not limited to the following:

    a. NMSA 1978 § 74-4-1 et seq., Hazardous Waste Act

58. Defendants were negligent per se when they violated the federal laws and regulations of the United States of America which include, but are not limited to the

following:

        a. 33 U.S.C. 1311, Effluent limitations

59. Defendants United States and Environmental Restoration additionally breached their duties by failing to reasonably screen and select contractors and sub-contractors with the experience and expertise necessary to safely excavate the Gold King Mine portal, and by excavating prior to the arrival of the Harrison Western with such experience and expertise.

60. Defendants acted together to create the conditions that harmed the Plaintiffs and are jointly and severally liable for the harm caused by their tortious conduct. Each of the Defendants' unlawful acts and omissions have directly, foreseeably, and proximately caused, and continue to cause, injury to the Plaintiffs in an amount to be determined at trial.

## **SECOND CLAIM FOR RELIEF**

(GROSS NEGLIGENCE AGAINST ALL DEFENDANTS)

61. The Plaintiffs incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

62. The Defendants breached the duties described herein in a reckless, willful or otherwise indifferent manner constituting more than mere carelessness.

63. Defendants blatantly disregarded known pressurized conditions at the Gold King Mine site and conducted activities on site in a reckless manner indifferent to the likely impact on downstream communities.

64. Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct. Each of the Defendants' unlawful acts and omissions have directly, foreseeably, and proximately caused, and continue to cause, injury to the Plaintiffs in an amount to be determined at trial.

## **THIRD CLAIM FOR RELIEF**

(TRESPASS AGAINST ALL DEFENDANTS)

65. The Plaintiffs incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

66. Because the Animas River passes through the Plaintiffs land, the Plaintiffs' own or have other legal property rights and interests in and on the land affected by the August 5 Release.

67. Defendants are and were at all relevant times required to abstain from unlawfully intruding or invading upon the property rights of the Plaintiffs.

68. Defendants Environmental Restoration and Weston contracted with the USEPA to provide technical services at the Gold King Mine site and intended to excavate at the Gold King Mine Level 7 adit. Defendant United States, through its agent USEPA, and Defendants Environmental Restoration and Weston knew or should have known that the conditions at the Gold King Mine site presented the possibility of a blowout and their actions could reasonably increase the likelihood of a blowout.

69. Defendant United States, through its agent, USEPA, and Defendants Environmental Restoration, and Weston knew that, in the event of a blowout, highly contaminated water impounded behind the Level 7 adit at the Gold King Mine would make its way from Cement Creek down to the Animas River, crossing through the Plaintiffs' property.

70. By causing or otherwise contributing to the August 5 Release, which sent more than three million gallons of toxic wastewater and other contaminants through the Animas River that passes through the Plaintiffs' land, Defendants invaded or otherwise caused other Defendants to invade or intrude upon the property rights of the Plaintiffs without permission. Some of the contaminants still remain on the Plaintiffs' property.

71. This invasion by the Defendants directly, foreseeably, and proximately caused injury to the Plaintiffs' property rights in various ways including but not limited to the enjoyment of their property, and the destruction of vegetation on their property, and as otherwise described herein in an amount to be determined at trial.

72. Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct. The Plaintiffs are entitled to recover damages from Defendants and to entry of an order compelling Defendants to abate the trespass.

### **FOURTH CLAIM FOR RELIEF**

(PRIVATE NUISANCE AGAINST ALL DEFENDANTS)

73. The Plaintiffs incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

74. Because the Animas River passes through the land and homes of Plaintiffs, the Plaintiffs own or have other legal property rights and interests in and on the land affected by the August 5 Release.

75. The Defendants' acts and omissions leading up to and in connection with the August 5 Release substantially and unreasonably interfered with the Plaintiffs' use and enjoyment of their land and property in that the impact of the August 5 Release continues to interfere with the Plaintiffs' use of the land in considerable ways, including affecting their water supply, irrigation needs, recreational uses, and other interferences as described herein.

76. This unlawful interference by the Defendants directly, foreseeably, and proximately caused and continues to cause injury to the Plaintiffs' property and other legal interests in an amount to be determined at trial.

77. Defendants acted together to create these conditions, and are jointly and severally

liable for the harm caused by their tortious conduct.

78.     The Plaintiffs' are entitled to recover damages from Defendants and to entry of an order compelling Defendants to abate the nuisance.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter an order and judgment:

(1) Against Defendants Environmental Restoration, Weston, for compensatory, and consequential, damages for injuries directly and proximately caused by Defendants' conduct, as described herein, in an amount to be determined at trial;

(2) Against Defendant United States for compensatory and consequential damages for injuries directly and proximately caused by its conduct through its agent, USEPA, as described herein, in an amount to be determined at trial;

(3) Ordering all Defendants to abate the nuisance and cure the trespass within the Plaintiffs' property;

(4) Declaring that all Defendants are jointly and severally liable for all costs incurred and costs that may be incurred by the Plaintiffs to abate the nuisance and cure the trespass within the Plaintiffs' property;

(5) Against Defendants Environmental Restorations, LLC, Gold King Mine Corporation, Weston Solutions Inc., and Harrison Western Construction Corporation, for pre-judgment and post-judgement interest and punitive damages, to the extent not prohibited by law.

(6) Against all Defendants, for attorneys' fees, costs, and expenses, and such other and further relief as the Court may deem just and equitable.

Respectfully submitted:

WILL FERGUSON & ASSOCIATES

*/s/ Kedar Bhasker*
KEDAR BHASKER
ADRIAN VEGA

*Attorneys for Plaintiff*
1720 Louisiana Blvd. NE, Suite 100
Albuquerque, NM 87110
Phone: 505 243-5566
Fax: 505 243-5699

Case 1:17-cv-00710-WJ-SCY    Document 1    Filed 07/07/17    Page 19 of 19