IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN RE: GOLD KING MINE RELEASE
IN SAN JUAN COUNTY, COLORADO,  No. 1:18-md-02824-WJ
ON AUGUST 5, 2015

*This Document Relates to:*   No. 1:16-cv-00465-WJ-LF
　　　　　　　　　　　　　　No. 1:16-cv-00931-WJ-LF
　　　　　　　　　　　　　　No. 1:17-cv-00710-WJ-SCY
　　　　　　　　　　　　　　No. 1:18-cv-00319-WJ

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Sunnyside Gold Corporation, Kinross Gold U.S.A. Inc., and Kinross Gold Corporation's ("Mining Defendants") Combined Motion to Dismiss and Supporting Memorandum, Doc. 42, filed July 25, 2018. For the reasons stated below, the Motion is **GRANTED in part** and **DENIED in part.**

**Background Regarding the Mining Defendants**

Defendants Sunnyside Gold Corporation ("SJC"), Kinross Gold U.S.A. Inc. ("KGUSA"), and Kinross Gold Corporation ("KGC") describe their corporate ownership as follows. *See* Doc. 42 at 7. All of SJC's shares are owned by Echo Bay, Inc., which is a wholly-owned subsidiary of KGUSA. KGUSA is a wholly-owned subsidiary of Bema Gold (U.S.) Inc., which is a wholly-owned subsidiary of KGC.

SGC owns the Sunnyside Mine, which it operated from 1986 until 1991. Doc. 42 at 1. SJC closed the Sunnyside Mine in accordance with its permits and the law under Colorado's supervision in accordance with a Colorado state court Consent Decree. Doc. 42 at 1. The closure was fully implemented by 2003. Neither KGUSA nor KGC owned any interest in SGC, nor in any entity that owned an interest in SGC before 2003. Doc. 42 at 2. "Neither KGUSA nor KGC played any role, directly or indirectly, in the operation or closure of the Sunnyside

Mine." Doc. 42 at 2.  "Neither SGC, KGUSA, nor KGC owns or has ever owned any interest in the Gold King Mine." Doc. 42 at 2.

**Personal Jurisdiction**

The Mining Defendants move the Court to dismiss Sovereign Plaintiffs' First Amended Complaints for lack of personal jurisdiction and for failure to state a claim.  The Mining Defendants argue that they did not have the minimum contacts with the Sovereign Plaintiffs.

"[T]he 'minimum contacts' standard requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' defendant's forum-related activities." *Dudnikov v. Chalk & Vermilion fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008).  There is purposeful direction if (i) there is an intentional action, (ii) that was expressly aimed at the forum state, (iii) with knowledge that the brunt of the injury would be felt in the forum state. *See Dudnikov v. Chalk & Vermilion fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008).

The Sovereign Plaintiffs have alleged sufficient facts to make a *prima facie* showing of personal jurisdiction over the Mining Defendants.  The Sovereign Plaintiffs allege that SJC knew that installing bulkheads in the Sunnyside Mine and closing the water treatment plant would cause toxic mine water to enter the workings of other mines, including Gold King Mine, and then enter the Animas and San Juan Rivers, where it would flow downstream into New Mexico and Utah.  *See* NM FAC ¶¶ 5-7; NN FAC ¶¶ 45-55; UT FAC ¶¶ 82-101.  The Sovereign Plaintiffs allege that KGUSA, acting as KGC's agent or alter ego, "directed or controlled the conduct of Sunnyside Gold and operations at the Sunnyside Mine."  *See* NM FAC ¶¶ 45; NN FAC ¶ 40; UT FAC ¶¶ 24.

The Mining Defendants argue that the Amended Complaints make clear that "the event complained of is the August 5, 2015 Blowout" which "was caused by the conduct of EPA and its contractors." Doc. 42 at 14. They also argue that the "'purposeful or intentional action' undertaken by SGC was performance of its Consent Decree obligations, which were done to impound water in Colorado and 'to protect the waters of the State of Colorado.'" Doc. 42 at 14. The Mining Defendants also assert that "beyond KGUSA's acquisition of an indirect ownership of SGC in 2003, and KGC's indirect ownership of KGUSA, neither KGUSA nor KGC undertook any action at all" directed at New Mexico or Utah. Doc. 42 at 14; *see also* Declaration of Martin D. Litt, Vice-President and General Counsel for KGUSA, Doc. 42-3 (stating that the allegations that KGUSA has "controlled and directed" SGC's activities at Sunnyside Mine are untrue).

Although the Mining Defendants have disputed the jurisdictional allegations in the Complaints, there has been no evidentiary hearing. Consequently, the Court must, at this time, resolve all factual disputes in favor of Plaintiff Utah.

> Where there has been no evidentiary hearing, as in this case, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists. All factual disputes are resolved in favor of the plaintiffs when determining the sufficiency of this showing.

*Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009) (quotation marks, ellipses and citations omitted).

**Preemption of Claims by the Clean Water Act**

The Mining Defendants contend that the Clean Water Act preempts the Sovereign Plaintiffs' tort claims and the claims pursuant to Utah's Water Quality Act and Utah's hazardous waste laws. Doc. 42 at 17. The Mining Defendants cited a United States Supreme Court case

where "Vermont landowners brought Vermont common law nuisance claims against a New York mill that discharged into a lake forming part of the New York – Vermont border," and the "central issue was whether the CWA 'preempts a common-law nuisance suit filed in a Vermont court under Vermont law, when the source of the alleged injury is located in New York.'" Doc. 42 at 18. The United States Supreme Court held "that when a court considers a state-law claim concerning interstate water pollution that is subject to the CWA, the court must apply the law of the State in which the point source is located." *International Paper Co. v. Ouellette*, 479 U.S. 481, 487 (1987). The Mining Defendants conclude that the "Sovereign Plaintiffs' claims under common law, New Mexico law, Utah law, or the law of any state other than Colorado, are preempted." Doc. 42 at 23.

The Sovereign Plaintiffs argue that the "Mining Defendants argue only that the Sovereign Plaintiffs' tort claims under 'the law of any state *other than Colorado*, are preempted,'" "at *most*, the Mining Defendants contend that the Court should not apply any other state's laws to the Sovereign Plaintiffs' common law tort claims," and "do not explain, however, how a question regarding choice of law justifies dismissal of the tort claims." Doc. 67 at 41, 42.

The Court grants the Mining Defendants' motion to dismiss the Sovereign Plaintiffs' tort claims as preempted by the CWA to the extent the Sovereign Plaintiffs seek to assert those claims under the law of any state other than Colorado.

The Sovereign Plaintiffs' also argue that the Mining Defendants are "wrong that claims under the Utah Water Quality Act and the Utah Solid and Hazardous Waste Act are precluded by *International Paper Co. v. Ouellette* and its progeny." Doc. 67 at 42 (citations to statutes and case omitted). The Sovereign Plaintiffs contend that "Mining Defendants ignore the CWA's two

savings clauses, which expressly preserve state-law remedies." Doc. 67 at 42. One of the savings clauses of the CWA, entitled "State Authority," provides that:

> nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof . . . to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution . . . or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

33 U.S.C. § 1370. The other savings clause, entitled "Statutory or common law rights not restricted," provides: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 33 U.S.C. § 1365(e).

> The United State Supreme Court rejected a similar argument in *Ouellette*:
>
> Congress intended the 1972 Act amendments to "establish an all-encompassing program of water pollution regulation" . . . The [Clean Water] Act applies to all point sources and virtually all bodies of water. . . The CWA also provides its own remedies, including civil and criminal fines for permit violations, and "citizen suits" that allow individuals (including those from affected States) to sue for injunction to enforce the statute. In light of this pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law, it is clear that the only state suits that remain available are those specifically preserved by the Act.
>
> Although Congress intended to dominate the field of pollution regulation, the saving clause negates the inference that Congress "left no room" for state causes of action. Respondents read the language of the saving clause broadly to preserve both a State's right to regulate its waters, 33 U.S.C. § 1370, and an injured party's right to seek relief under "any statute *or common law,*" § 1365(e) (emphasis added). They claim that this language and selected portions of the legislative history compel the inference that Congress intended to preserve the right to bring suit under the law of any affected State. We cannot accept this reading of the Act.
>
> To begin with, the plain language of the provisions on which respondents rely by no means compels the result they seek. Section 505(e) merely says that "[n]othing *in this section,*" *i.e.,* the citizen-suit provisions, shall affect an injured party's right to seek relief under state law; it does not purport to preclude pre-emption of state

5

> law by other provisions of the Act. Section 510, moreover, preserves the authority of a State "with respect to the waters (including boundary waters) of such Stat[e]." This language arguably limits the effect of the clause to discharges flowing *directly* into a State's own waters, *i.e.,* discharges from within the State. The savings clause, then, does not preclude pre-emption of the law of an affected State.
>
> Given that the Act itself does not speak directly to the issue, the Court must be guided by the goals and policies of the Act in determining whether it in fact pre-empts an action based on the law of an affected State. After examining the CWA as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the "full purposes and objectives of Congress." Because we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause, we conclude that the CWA precludes a court from applying the law of an affected State against an out-of-state source.

*International Paper Co. v. Ouellette*, 479 U.S. 481, 492-494 (1987) (citations omitted).

The Sovereign Plaintiffs then distinguish this case from *Ouellette* by pointing out that "*Ouellette* did not decide whether an affected state's *statutes* apply to pollution in its state water that was generated in another state—that issue was not before the Court." Doc. 67 at 42. The Sovereign Plaintiffs also state that "no permit covered the Gold King Mine on August 5 . . . Thus, unlike the discharges at issue in *Ouellette*, the discharges from the God King Mine and the Sunnyside Mine were not authorized by federal or state law at any time relevant to this lawsuit." Doc. 67 at 43 (quoting *Ouellette*: "The CWA precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act.").

The Court concludes that the CWA preempts Utah's statutory claims. In another case discussing *Ouellette*, the United States Supreme Court stated: "The Court [in *Ouellette*] held the Clean Water Act taken 'as a whole, its purposes and its history' pre-empted an action based on the law of the affected State and that the *only* state law applicable to an interstate discharge is

6

'the law of the State in which the point source is located.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (*emphasis added*). The United States Supreme Court also discussed the means of protecting water quality in the Clean Water Act:

> The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Toward this end, the Act provides for two sets of water quality measures. "Effluent limitations" are promulgated by the EPA and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources. See §§ 1311, 1314. "[W]ater quality standards" are, in general, promulgated by the States and establish the desired condition of a waterway. See § 1313. These standards supplement effluent limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *EPA v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 205, n. 12, 96 S.Ct. 2022, 2025, n. 12, 48 L.Ed.2d 578 (1976).

*Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992); *see also* United States Environmental Protection Agency, Water Quality Standards Regulations: Colorado, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-colorado (presenting "water quality standards in effect for Clean Water Act (CWA) purposes for" Colorado which includes numeric standards for the San Juan River Basin and for the tributaries to the San Juan River). Whether there was a discharge permit for Gold King Mine is not determinative of whether Utah's statutory claims are preempted because: (i) *Arkansas* makes clear that "the *only* state law applicable to an interstate discharge is 'the law of the State in which the point source is located,'" and (ii) the interstate water pollution that is the subject of Utah's statutory claims is subject to the CWA through Colorado's water quality standards. Consequently, Utah's statutory claims are preempted by the CWA.

The Mining Defendants' motion to dismiss Utah's claims pursuant to the Utah Water Quality Act and Utah's hazardous waste laws as preempted by the CWA is granted.

7

**Colorado is not a Required Party**

The Mining Defendants state that the Amended Complaints assign fault to SGC for installing the engineered bulkheads in Colorado, and to SGC, KGUSA and KGC for failing to remove those bulkheads, which "were designed, engineered, installed and maintained in place pursuant to specific directives of the State of Colorado and the court approved Consent Decree. Consequently, any adjudication of possible fault associated with the installation of the bulkheads must, of necessity, include the State of Colorado." Doc. 42 at 23.

Rule 19(a)(1) of the Federal Rules of Federal Procedure states:

> **(1)** *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>> **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
>>
>> **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>
>>> **(i)** as a practical matter impair or impede the person's ability to protect the interest; or
>>>
>>> **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Mining Defendants assert that Colorado is a required party to this suit because "Colorado issued discharge permits to SGC and required the bulkheads as a permit obligation and through the court approved reclamation plan for the Sunnyside Mine," and "[b]ecause Colorado is the state in charge of regulating SGC's conduct, none of the regulatory relief the Sovereign Plaintiffs seek can be granted without Colorado's presence in this litigation." Doc. 42 at 24, 26. "Without Colorado in the lawsuit, the Mining Defendants would be left 'subject to a substantial risk of incurring . . . inconsistent obligations . . . .'" because "[t]o implement a

different water management strategy would violate the Colorado Consent Decree and subject SGC, KGUSA, and KGC to inconsistent legal obligations." Doc. 42 at 26-27; *see also* Doc. 74 at 25-26 (asserting that imposing money damages on the Mining Defendants for installing bulkheads, at a significant cost, pursuant to a court order creates a double or multiple obligation). The Mining Defendants also argue that "[b]ecause Colorado has a direct interest in seeing that its laws, regulations, and decrees are followed, Colorado's presence is clearly essential when downstream [S]tates request 'abatement' of any measures implemented pursuant to Colorado law." Doc. 42 at 24.

The Court denies the Mining Defendants' motion to dismiss the claims against them because the Mining Defendants have not shown that the State of Colorado is a required party. The Mining Defendants have not shown that the Court cannot tailor relief that would be consistent with the Consent Decree. *See also* NM FAC ¶¶ 42 ("the court terminated the consent decree"); NN FAC ¶ 47 ("the consent decree was terminated"). Moreover, the Court may not have jurisdiction to order abatement at the Sunnyside Mine if it would interfere with the CERCLA remedy. *See* Mem. Op. and Order at 11, Doc. 164, filed February 28, 2019 (quoting 42 U.S.C. § 9613(h) ("No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action")). Nor have the Mining Defendants shown that the Court cannot tailor an appropriate remedy regarding money damages if, as the Mining Defendants contend, they could not then and cannot now "ignore the clear mandates established by [the State of Colorado's reclamation directives] and the Consent Decree." Doc. 74 at 25.

**CERCLA 113(h) bars challenges**

The Mining Defendants assert that the "Sovereign Plaintiffs' claims seeking Court ordered abatement of the alleged trespass and nuisance, as well as the prayers for relief seeking a

9

declaration that the Mining Defendants are liable for all costs incurred and costs that may be incurred to abate the nuisance and cure the trespass, are foreclosed by federal law," because "EPA has initiated a response action that extends all the way to Lake Powell."  Doc. 42 at 32.  The Mining Defendants cite Section 113(h) of CERCLA, which provides, in relevant part: "No Federal court shall have jurisdiction . . . under State law . . . to review any challenges to removal or remedial action selected under section 9604 of this title."  42 U.S.C. § 9613(h).  *See Cannon v. Gates*, 538 F.3d 1328, 1334-35 (10th Cir. 2008) ("The statutory definition of a removal action dictates that a removal action is ongoing and thus, § 9613(h)'s jurisdiction strip applies, even if the Government has only begun to 'monitor, assess, and evaluate the release or threat of release of hazardous substances;" "a suit challenges a removal action if it 'interferes with the implementation of a CERCLA remedy' because 'the relief requested will impact the [removal] action selected").  The Mining Defendants assert that "granting any relief in New Mexico, within the Navajo Nation, or in Utah would conflict and interfere with EPA's exclusive jurisdiction over its on-going response action activities and cleanup remedies.

New Mexico and Utah have alleged that EPA has not commenced, and has not decided whether it will ever commence, any remedial actions in the Sovereign Plaintiffs' territories.  *See* NM FAC ¶ 119 ("EPA's site boundary entirely excludes the Animas River"); UT FAC ¶ 63 ("EPA is not and has not engaged in a removal action in the State of Utah").  At the June 19, 2018, Initial Conference counsel for the Navajo Nation and Utah suggested jurisdictional discovery might be needed.  Transcript at 34:6-12, 35:4-13, Doc. 35, filed June 26, 2018.  The Court has denied the Federal Defendants' motion to dismiss pursuant to 42 U.S.C. § 9613(h) [Section 113(h) of CERCLA], which "prevents a court from interfering with an ongoing removal action," to allow for jurisdictional discovery.   *See* Doc. 164 at 14-15, filed February 28, 2019.

10

The Court denies the Mining Defendants' motion to dismiss Plaintiffs' claims seeking abatement at this time to allow for jurisdictional discovery regarding the issue of whether abatement in New Mexico and/or Utah would interfere with EPA's remedial action.

**CERCLA Liability Claims as Owners, Operators, and Arrangers**

The Mining Defendants seek dismissal of the claims for cost recovery damages under CERCLA on the grounds that Plaintiffs' allegations fail to state a claim for relief against EPA under CERCLA because they have not adequately alleged that KGUSA or KGC are liable as an "owner," "operator," or "arranger."

CERCLA Liability

Section 9607 establishes that owners or operators of a facility, arrangers of waste disposal or treatment, and persons who accepts waste for transport to disposal or treatment facilities:

> shall be liable for—
>
> **(A)** all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> **(B)** any other necessary costs of response incurred by any other person consistent with the national contingency plan;
>
> **(C)** damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
>
> **(D)** the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4).

Owner Liability

The Mining Defendants assert that the Sovereign Plaintiffs have failed to state a claim against either KGUSA or KGC for CERCLA owner liability.  42 U.S.C. § 9607(a)(2) imposes

liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  The Mining Defendants point the Court to *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1273 (10th Cir. 2017), which states, for purposes of asserting CERCLA owner liability, "[t]he ordinary or natural meaning of 'owner' includes, at a minimum, a legal title holder."  Doc. 42 at 33. *Chevron Mining* cites the definition of "owner" given in Black's Law Dictionary (10th ed. 2014) which is "Someone who has the right to possess, use, and convey something; a person in whom one or more interests are vested."

The Sovereign Plaintiffs have stated claims for CERCLA owner liability because they alleged that KGC and/or KGUSA funded, directed and controlled remediation activities at the Sunnyside Mine.  *See* NM FAC ¶¶ 47-50; NN FAC ¶ 40; UT FAC ¶¶ 24-28.  Those allegations plausibly state a claim that KGC and KGUSA had a right to possess or use the Sunnyside Mine.

<u>Operator Liability</u>

The Supreme Court of the United States noted the "uselessness of CERCLA's definition of a facility's 'operator' as 'any person … operating' the facility," and gave the term "operator" its "ordinary or natural meaning:"

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998); *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003) (noting that in *Bestfoods*, the Supreme Court sharpened the definition of "operator" for purposes of CERCLA's concern with environmental contamination, and quoting the sharpened definition in *Bestfoods*).

The Sovereign Plaintiffs' Complaints state claims for operator liability because they allege that SJC treated discharged mine water and later installed bulkheads to block the mine drainage, and that later KGC and/or KGUSA "directed or controlled the conduct of [SJC] and operations at the Sunnyside Mine," including SJC's "remediation activities near Silverton." *See* NM FAC ¶¶ 30-51; NN FAC ¶¶ 40, 49-52; UT FAC ¶¶ 24-27.

Arranger Liability

The Mining Defendants assert that Utah's First Amended Complaint fails to state a claim against either KGUSA or KGC for CERCLA arranger liability.

> To be held liable under CERCLA as an arranger, a party must satisfy three requirements. First, the party must be a "person" as defined in CERCLA. Second, the party must "own" or "possess" the hazardous substance at issue. Third, the party must, *by contract, agreement or otherwise*, arrange for the transport or disposal of such hazardous substances. *See* 42 U.S.C. § 9607(a)(3).

*Raytheon Contructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1219 (10th Cir. 2003) (*emphasis added*); *Burlington Northern v. Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009) ( "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance").

The Sovereign Plaintiffs' Complaints state claims for arranger liability because they allege that the KGUSA and KGC (i) took intentional steps to dispose of a hazardous substance in that KGUSA and KGC "controlled and directed [SGC's] activities at the Sunnyside Mine," which included SGC installing bulkheads to block mine drainage; (ii) KGUSA and/or KGC "provided a $1,250,000 irrevocable letter of credit to the Colorado Division of Minerals and Geology as surety for its reclamation work at the American Tunnel,[1] but later reduced and then

---

[1] "Beginning in 1959, the owner of the nearby Sunnyside Mine developed the 'American Tunnel' as a drainage and ore transportation passage for the Sunnyside Mine. The American Tunnel was

13

eliminated the amount;" (iii) SGC "transferred ownership of its water treatment facility and discharge permit for the American Tunnel to Gold King Corp.; and (iv) SGC's "manager of reclamations activities   was to supervise" Gold King Corp.'s owner's operation of the water treatment facility until Gold King Corp's owner obtained certification to operate the water treatment facility." *See* UT FAC ¶¶ 23-24, 25, 27, 28.

**Punitive Damages**

The Mining Defendants state that the punitive damages claims must be dismissed based on the allegations in the Complaints.  *See* Doc. 42 at 38-41.  After setting forth the legal standards for punitive damages in Utah,[2] New Mexico[3] and Colorado,[4] the Mining Defendants contend that the Sovereign Plaintiffs have not plead any aggravating circumstances that would allow for the imposition of punitive damages against any Mining Defendant.

The Court denies the motion to dismiss the requests for punitive damages.  First, a request for punitive damages is not the proper subject of a Rule 12(b)(6) motion because such a request is not a separate cause of action.  *See Mason v. Texaco, Inc.* 948 F.2d 1546, 1554 (10th Cir. 1991) ("A punitive damage claim is not an independent cause of action or issue separate from the balance of a plaintiff's case.  It is part and parcel of a liability determination and does not have any independent being until a jury has decided . . . that not only was a defendant's conduct negligent, but that it was gross, willful, wanton or malicious").  Furthermore, the

---

originally an exploratory tunnel into the Gold King vein system and provided a pathway for contaminated water to move from the Sunnyside Mine to the Gold King Mine."  UT FAC ¶ 19.

[2] "(1) willful and malicious or intentionally fraudulent conduct or (2) a knowing and reckless indifference toward, and a disregard of, the rights of others."  Doc. 42 at 39.

[3] "To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level."  Doc. 42 at 39-40.

[4] "Colorado requires a showing of 'fraud, malice, or willful and wanton conduct' to support punitive damages."  Doc. 42 at 40.

allegations in the Sovereign Plaintiffs' Complaints state plausible claims for punitive damages. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) ("the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims").

**IT IS ORDERED** that Defendants Sunnyside Gold Corporation, Kinross Gold U.S.A. Inc., and Kinross Gold Corporation's Combined Motion to Dismiss and Supporting Memorandum, Doc. 42, filed July 25, 2018, is **GRANTED in part** and **DENIED in part.** The Court grants the Mining Defendants' motion to dismiss: (i) the Sovereign Plaintiffs' tort claims as preempted by the Clean Water Act to the extent the Sovereign Plaintiffs seek to assert those claims under the law of any state other than Colorado; and (ii) Utah's claims pursuant to the Utah Water Quality Act and the Utah Solid and Hazardous Waste Act, because they are preempted by the Clean Water Act. The Court denies the remainder of the Mining Defendants' motion to dismiss.

_____
**WILLIAM P. JOHNSON**
**CHIEF UNITED STATES DISTRICT JUDGE**